MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

MATTHEW M. YELOVICH (NYBN 4897013)
Deputy Chief, Criminal Division

MARJA-LIISA OVERBECK (CABN 261707)
LEIF DAUTCH (CABN 283975)
ASEEM PADUKONE (CABN 298812)
Assistant United States Attorneys

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7200
     FAX: (415) 436-7234
     mari.overbeck@usdoj.gov
     leif.dautch@usdoj.gov
     aseem.padukone@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO. 21-CR-328 YGR** |
| Plaintiff, | **UNITED STATES' TRIAL MEMORANDUM** |
| v. | Hon. Yvonne Gonzalez Rogers |
| DAVID CERVANTES, JAMES PEREZ, GUILLERMO SOLORIO, GEORGE FRANCO, and TRINIDAD MARTINEZ, | Jury Selection:   June 3, 2024<br>Trial Date:      June 17, 2024 |
| Defendants. | |

# **TABLE OF CONTENTS**

I.      CASE STATUS ........................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................1

        A.      The Structure of the Nuestra Familia Enterprise ...................................1

        B.      The Rules of the Nuestra Familia Enterprise .........................................4

        C.      Communication Between Members of the Nuestra Familia Enterprise ...........4

        D.      The Trial Defendants .............................................................................5

III.    APPLICABLE STATUES .....................................................................................6

        A.      Statutory Language ................................................................................6

        B.      Applicable Law ......................................................................................7

                1.      RICO Conspiracy ......................................................................7

                2.      Enterprise ...................................................................................9

                3.      Employed By or Associated with the Enterprise ...................10

                4.      Conducted or Participated in the Affairs of the Enterprise.....10

                5.      Pattern of Racketeering Activity .............................................11

                6.      Effect on Interstate Commerce ................................................11

                7.      Uncharged Crimes ...................................................................12

                8.      Liability for Co-Conspirator Acts: *Pinkerton* Liability .........12

IV.     OVERVIEW OF TRIAL SCOPE ........................................................................13

V.      EVIDENTIARY ISSUES .....................................................................................16

        A.      Stipulations ..........................................................................................16

        B.      Admissibility of Evidence....................................................................16

                1.      Authentication and Identification/Chain of Custody ............16

                2.      Photographs...............................................................................18

                3.      Self-Authenticating Records & Charts and Summaries.........18

        C.      Miscellaneous Matters .........................................................................20

                1.      Cooperator Jail Calls ...............................................................20

                2.      Reciprocal Discovery ...............................................................21

3.    Scope of Lay Witness Testimony .................................................................21

4.    Witness Exclusion...........................................................................................22

1

# <u>TABLE OF AUTHORITIES</u>

*Barsky v. United States*
    339 F.2d 180 (9th Cir. 1964) ................................................................. 19, 20

*Blumenthal v. United States*
    332 U.S. 539 (1947) ......................................................................................... 9

*Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.*
    466 F.2d 722 (7th Cir. 1972) ...................................................................... 20

*Gallego v. United States*
    276 F.2d 914 (9th Cir. 1960) ...................................................................... 18

*Gonzales v. Raich*
    545 U.S. 1 (2005) ............................................................................................ 11

*H.J. Inc. v. Northwestern Bell Telephone Co.*
    492 U.S. 229 (1989)........................................................................................ 11

*Lucero v. Stewart*
    892 F.2d 52 (9th Cir. 1989) ........................................................................ 18

*Microsoft v. Odom*
    486 F.3d 541 (9th Cir. 2007) ................................................................. 9, 10

*Pinkerton v. United States*
    328 U.S. 640 (1946)......................................................................... 7, 12, 13

*Reves v. Ernst & Young*
    507 U.S. 170 (1993)........................................................................................ 11

*Reyes v. United States*
    383 F.2d 734 (9th Cir. 1967) ...................................................................... 18

*Salinas v. United States*
    522 U.S. 52 (1997).................................................................................... 7, 8

*Securities Exchange Commission v. Franklin*
    348 F. Supp. 2d 1159 (S.D. Cal. 2004) ................................................... 18

*Taylor v. United States*
    579 U.S. 301 (2016)........................................................................................ 12

*United States v. Abbas*
    504 F.2d 123 (9th Cir. 1974) ...................................................................... 20

*United States v. Abushi*
    682 F.2d 1289 (9th Cir. 1982) ...................................................................... 9

*United States v. Bagnariol*
  665 F.2d 877 (9th Cir. 1981) ................................................................................ 11

*United States v. Baras*
  No. CR 11-00523 YGR, 2013 WL 6502846 (N.D. Cal. Dec. 11, 2013) ..................... 22

*United States v. Baxter*
  492 F.2d 150 (9th Cir. 1973) .................................................................................. 9

*United States v. Becker*
  720 F.2d 1033 (9th Cir. 1983) ................................................................................. 9

*United States v. Bibero*
  749 F.2d 581 (9th Cir. 1984) ................................................................................. 13

*United States v. Black*
  767 F.2d 1334 (9th Cir. 1985) ............................................................................... 17

*United States v. Blackwell*
  694 F.2d 1325 (D.C. Cir. 1982) ............................................................................. 17

*United States v. Blackwood*
  878 F.2d 1200 (9th Cir. 1989) ............................................................................... 17

*United States v. Boone*
  951 F.2d 1526 (9th Cir. 1991) ................................................................................. 9

*United States v. Boyle*
  556 U.S. 938 (2009) .............................................................................................. 10

*United States v. Chang Ru Meng Backman*
  817 F.3d 662 (9th Cir. 2016) ................................................................................. 12

*United States v. Cloud*
  872 F.2d 846 (9th Cir. 1989) ................................................................................... 8

*United States v. Corrado*
  286 F.3d 934 (6th Cir. 2002) ................................................................................... 8

*United States v. Davidson*
  122 F.3d 531 (8th Cir. 1997) ................................................................................... 9

*United States v. De Bright*
  730 F.2d 1255 (9th Cir. 1984) ............................................................................... 18

*United States v. De Peri*
  778 F.2d 963 (3rd Cir. 1985) ................................................................................. 19

*United States v. Delgado*
   401 F.3d 290 (5th Cir. 2005) .......................................................................... 10

*United States v. Disalvo*
   34 F.3d 1204 (3d Cir. 1994)............................................................................. 13

*United States v. Fernandez*
   388 F.3d 1199 (9th Cir. 2004) ..................................................................... 8, 11

*United States v. Freeman*
   498 F.3d 893 (9th Cir. 2007) .......................................................................... 22

*United States v. Gabriele*
   63 F.3d 61 (1st Cir. 1995)............................................................................... 10

*United States v. Gardner*
   611 F.2d 770 (9th Cir. 1980) .......................................................................... 19

*United States v. Garza*
   980 F.2d 546 (9th Cir. 1992) ............................................................................ 9

*United States v. Glecier*
   923 F.2d 496 (7th Cir. 1991) ............................................................................ 8

*United States v. Gonzalez*
   921 F.2d 1530 (11th Cir. 1991) ........................................................................ 8

*United States v. Harrington*
   923 F.2d 1371 (9th Cir. 1991) ........................................................................ 17

*United States v. Hegwood*
   977 F.2d 492 (9th Cir. 1992) ............................................................................ 9

*United States v. Henderson*
   241 F.3d 638 (9th Cir. 2000) .......................................................................... 18

*United States v. Hernandez*
   876 F.2d 774 (9th Cir. 1989) ............................................................................ 9

*United States v. Johnson*
   594 F.2d 1253 (9th Cir. 1979) ........................................................................ 19

*United States v. Kaiser*
   660 F.2d 724 (9th Cir. 1981) .......................................................................... 17

*United States v. Keltner*
   147 F.3d 662 (8th Cir. 1998) .......................................................................... 12

*United States v. King*
  472 F.2d 1 (9th Cir. 1973) ............................................................................................ 17

*United States v. Krasovich*
  819 F.2d 253 (9th Cir. 1987) .......................................................................................... 9

*United States v. Lewis*
  787 F.2d 1318 (9th Cir. 1986) ...................................................................................... 13

*United States v. Little*
  753 F.2d 1420 (9th Cir. 1984) ...................................................................................... 23

*United States v. Marino*
  277 F.3d 11 (1st Cir. 2002) .......................................................................................... 10

*United States v. Matera*
  489 F.3d 115 (2d Cir. 2007).......................................................................................... 12

*United States v. Meyers*
  847 F.2d 1408 (9th Cir. 1988) ...................................................................................... 19

*United States v. Natale*
  526 F.2d 1160 (2d Cir. 1975)........................................................................................ 17

*United States v. Nguyen*
  255 F.3d 1335 (11th Cir. 2001) ...................................................................................... 8

*United States v. Olano*
  62 F.3d 1180 (9th Cir. 1995) .................................................................................. 13, 20

*United States v. Oreto*
  37 F.3d 739 (1st Cir. 1994)............................................................................................ 11

*United States v. Owens*
  167 F.3d 739 (1st Cir. 1999).......................................................................................... 10

*United States v. Perez*
  962 F.3d 420 (9th Cir. 2020) ........................................................................................ 22

*United States v. Persico*
  832 F.2d 705 (2d Cir. 1987)............................................................................................ 8

*United States v. Radseck*
  718 F.2d 233 (7th Cir. 1983) ........................................................................................ 19

*United States v. Reed*
  726 F.2d 570 (9th Cir. 1984) ........................................................................................ 13

*United States v. Richardson*
    167 F.3d 621 (D.C. Cir. 1999) ................................................................. 9

*United States v. Rubino*
    431 F.2d 284 (6th Cir. 1970) ................................................................. 19

*United States v. Saavedra*
    684 F.2d 1293 (9th Cir. 1982) ................................................................. 13

*United States v. Salerno*
    108 F.3d 730 (7th Cir. 1997) ................................................................. 12

*United States v. Shirley*
    884 F.2d 1130 (9th Cir. 1989) ................................................................. 21

*United States v. Simas*
    937 F.2d 459 (9th Cir. 1991) ................................................................. 22

*United States v. Soulard*
    730 F.2d 1292 (9th Cir. 1984) ................................................................. 20

*United States v. Thomas*
    586 F.2d 123 (9th Cir. 1978) ................................................................. 9

*United States v. Thomas*
    835 F.2d 219 (9th Cir. 1987) ................................................................. 23

*United States v. Torralba-Mendia*
    784 F.3d 652 (9th Cir. 2015) ................................................................. 22

*United States v. Turkette*
    452 U.S. 576 (1981) ................................................................. 10

*United States v. Umagat*
    998 F.2d 770 (9th Cir. 1993) ................................................................. 13

*United States v. Vasquez*
    858 F.2d 1387 (9th Cir. 1988) ................................................................. 13

*United States v. Vera*
    770 F.3d 1232 (9th Cir. 2014) ................................................................. 22

*United States v. Virgen-Mendoza*
    91 F.4th 1033 (9th Cir. 2024) ................................................................. 12

*United States v. Wood*
    943 F.2d 1048 (9th Cir. 1991) ................................................................. 20

*United States v. Young*
    248 F.3d 260 (4th Cir. 2001) ................................................................................................. 21

Per the Court's Criminal Standing Order, the United States hereby files this trial memorandum to address the legal bases for the charges and the anticipated evidence, and to address any evidentiary, procedural, or other anticipated legal issues.

## I.    CASE STATUS

Trial in the above-captioned matter is set to begin with jury selection on June 3, 2024.  Opening statements will begin on June 17, 2024.  The Court will hold two pretrial conferences on April 29, 2024, and May 23, 2024.  All *in limine* and *Daubert* motions have been filed and will be heard at the April 29 pretrial conference.  The government previously estimated that trial would last into mid-September 2024.  This was a conservative estimate, and the government has now made significant cuts from its trial presentation and believes that trial will conclude in advance of that date.[1]  The government's current witness list (ECF No. 942) is its best effort to include all potential witnesses given that the parties are still meeting and conferring regarding potential stipulations.  The government is hopeful that many of the witnesses on its list will be unnecessary if the defense stipulates to chain of custody and authentication for physical items that were seized during searches and for extractions of seized electronic devices.

## II.    STATEMENT OF FACTS

The government intends to introduce evidence at trial to establish the following facts, among others:

### A.    The Structure of the Nuestra Familia Enterprise

Originally established in the 1960s as a rival to the Mexican Mafia, the Nuestra Familia ("NF") is composed today of a relatively small number of "made" members, known as "Cs" or "carnales," who sit atop the sprawling prison gang.  The government intends to show that the NF is a criminal organization that provides its members and associates with protection and security from rival organizations both inside and outside California correctional institutions, as well as a means for

---

[1] To date, the defendants have not provided the United States with any exhibits they plan to introduce at trial or listed any witnesses they plan to call to provide testimony.  The United States also has not received any defense discovery related to their case in chief.  *See* Fed. R. Crim. P. 16(b)(1)(A) (requiring the defendants to produce an item to the government if the "the defendant intends to use the item in the defendant's case-in-chief at trial").

generating illicit income and financial support, particularly for those members and associates who are incarcerated.  Falling under the "made" members are those who are selected to become members of the "Northern Structure" ("NS").  These "brothers" or "N-Sols" are mid-level management for the NF. Under the NS, the umbrella of the NF organization also encompasses members of subservient Norteño street gangs established in many cities and counties throughout California.  The evidence at trial will show that the Enterprise was engaged in acts involving murder, drug trafficking, and money laundering, among others.

The evidence at trial will show that at the head of the entire NF Enterprise sit three NF Generals: the General Advocate's Office or "GAO," the Street Regiment General or "SRG," and the General of Pintas/Prisons or "GOP."  According to the NF Constitution—which the government has noticed its intention to introduce a trial—"[t]he office of the SRG is responsible for the security and overall street operations."  The NF Constitution also specifies that "[t]he Office of the GOP is responsible for the security and overall pinta functions."  Further, the NF Constitution states, "[t]he office of the GAO is the justice department and responsible for looking into any alleged constitutional violations and/or individual C's suffering unjust abuse of power."  The GAO is also tasked with maintaining the pot of illicit proceeds provided to the NF otherwise referred to as the NF "bank."

The evidence at trial also will show that to form a type of checks and balances on the Generals, the NF formed an "Inner Council" ("IC"), composed of at least four NF members.  The members of the IC are designated by the NF Constitution as "advisors" to the NF Generals.  The four IC members and the three NF Generals combine to form the 7-member "General Council" ("GC") to make significant decisions in conducting the affairs of the NF.  As set forth below, the government intends to prove at trial that the five trial defendants were five of these seven GC members during the relevant period.[2]

Moreover, NF members (including GC members) are designated by either Category I, Category II, or Category III (oftentimes referred to as CAT-I, CAT-II, or CAT-III).  CAT-III is the highest-ranking status for an NF member to hold.  NF Generals and IC or GC members are required to be CAT-III members of the NF.  Next, CAT-II members of the NF are ranked immediately below CAT-III

---

[2] Two other of the seven members—Antonio Guillen and Samuel Luna—have pleaded guilty and been sentenced.

1    members.  Below CAT-II members are CAT-I members, who are the lowest-ranking NF members.

2    Each rank carries specific responsibilities, and such rankings within the NF membership are based on

3    "time and grade"—seniority in the organization and criminal activity conducted in the interest of the NF.

4          Evidence at trial will further show how the NF Enterprise is structured, both inside and outside

5    of California prisons.  Outside of custodial settings, the NF has organized its subordinate groups into

6    geographic territories called "street regiments."  Street regiments are generally formed by county.  While

7    all street regiments ultimately answer to the SRG, each street regiment is typically controlled by an

8    incarcerated NF member who has been appointed by the SRG and is generally referred to as the

9    "regiment commander."  A regiment commander ("RC") will usually use at least two other NF or NS

10   members to assist with overseeing, managing, directing, and otherwise controlling the criminal activity

11   conducted by NF, NS, and Norteño street gang members in the county or counties under their control.

12   These criminal activities include narcotics trafficking, robbery, acts involving murder, money

13   laundering, witness intimidation/tampering, and other racketeering activity for the benefit and continued

14   functioning of the NF, their regiment, and its members and associates.  In fact, one of the NF's purposes

15   of having established street regiments is to generate money from such illicit activity.  The NF will

16   collect from its street regiments a portion of profits of illicit activities and/or monthly "contributions" or

17   "dues" from street gang members (sometimes also referred to as "taxes"), which are then distributed

18   within the NF and its subordinate organizations.  Evidence at trial will show that the NF moves this

19   money through different mechanisms to conceal its source and location.

20         Inside the custodial setting, evidence at trial will show that the NF has organized into a similar

21   hierarchical structure in each jail or prison.  At the highest levels of leadership within facilities with an

22   NF presence, there will be an overall authority or regiment commander, appointed by the GOP, who is

23   responsible for all NF-related activity within that facility.  There will also be various other subordinate

24   levels of command, based on the facility's division of housing units and recreation yards.  As is the case

25   on the streets, inmates under the umbrella of a regiment are expected to commit criminal activities, such

26   as drug trafficking, and provide a portion of their illicit profits to be distributed within the regiment and

27   NF organization.

28

### B.      The Rules of the Nuestra Familia Enterprise

Evidence at trial will show that whether inside or outside of the custodial setting, NF, NS, and Norteño street gang members are expected to abide by their respective sets of rules and regulations. More particularly, NF members are required to abide by the NF Constitution.  This document provides for the structure of the organization, as well as basic membership requirements.  The NF Constitution also specifically provides for discipline for NF members who violate rules contained therein, which includes "expulsion" from the NF, or the killing of that NF member.  According to the NF Constitution, expulsion requires due process and a leadership vote, but is automatic under the NF Constitution "for any member Carnal turning traitor, coward, or deserter."  Evidence at trial will describe the "due process" provided to NF members who are accused of rules violations.

Though they are afforded a lessened level of due process, NS and Norteño gang members are also subject to discipline for failure to abide by the Enterprise's required rules and regulations.  The degree of punishment depends on the rule violation, which could range from being assigned additional exercise to being "deemed" or designated for "removal."  Those who are deemed or designated for removal are to be killed.

Witnesses will testify that the NF used violence and the threat of violence to control its members and associates.  The NF Enterprise routinely used violence to punish members and associates who broke Enterprise rules—members understand and agree that murder is an act in which the Enterprise can and will engage.  NF Enterprise members and associates know that violence, including acts involving murder, between themselves and groups such as the Mexican Mafia or Sureños is an ever-present possibility.  NF members and associates also understand and agree that they can be subject to being killed by the NF itself, such as for a violation of Enterprise rules.

### C.      Communication Between Members of the Nuestra Familia Enterprise

Evidence at trial will show that to maintain the continued functioning of the NF organization despite their custodial status, the NF leadership incarcerated within CDCR communicated with members and associates, both inside and outside the prison walls, through assigned "channels" or writings.  These writings were "micro-writings" known as "kites" or "wilas."  These communications were used frequently during the time that NF leadership and other NF members were incarcerated in the isolated

1  and restrictive environment of the Secure Housing Unit ("SHU") at Pelican Bay State Prison.

2  While these traditional types of communications are still used today, evidence at trial will show

3  that incarcerated NF leadership are known to more frequently use cellular telephones smuggled into the

4  prison system to communicate with other prisons and the streets through calls, text messages, and other

5  forms of communication (that include applications and encrypted messaging services).  Such methods of

6  communication were previously unavailable to these inmates until their release from the SHU and

7  transfer to the "mainline" of various CDCR facilities in approximately 2015-2016.

8  **D.    The Trial Defendants**

9  The government intends to introduce evidence at trial to establish that defendants Cervantes,

10  Perez, Martinez, Franco, and Solorio are high-ranking members of the NF Enterprise:

11  ***David Cervantes***.  David Cervantes (aka "DC") is a CAT-III NF member and NF General,

12  referred to as the General Advocates Office ("GAO").  As the GAO, he holds a significant position

13  within the NF organization, as he is considered the "Justice Department" and is responsible for receiving

14  "complaints" containing allegations of wrongdoing within the NF, appointing investigators to the case,

15  accepting or modifying the findings and recommendations of the investigators, sending such

16  recommendations to the General Council ("GC") for a majority vote, and enforcing the will of the GC's

17  vote.  He also is the holder of the "main bank" to which the proceeds of all NF drug sales are partially

18  sent.  Cervantes also was the Regiment Commander of the Kings County Street Regiment, confirmed by

19  intercepted communications that the government intends to introduce.

20  ***James Perez***.  James Perez (aka "Conejo") is a CAT-III NF member and NF General,

21  specifically the General of Pintas/Prisons ("GOP").  As GOP, he maintains authority over all NF

22  regiments within the California prison system.  His responsibilities include appointing NF members and

23  associates to leadership positions within CDCR facilities, as well as overseeing and regulating criminal

24  activity occurring in these facilities.  In his role as GOP, Perez collected a portion of profits from the

25  prison regiments for the GOP bank, a portion of which is earmarked for the main bank.  He was also the

26  Regiment Commander of the San Mateo County Street Regiment.

27  ***George Franco***.  George Franco (aka "Puppet") is a CAT-III NF member and member of the

28  NF's Inner Council.  Franco was also Regiment Commander of San Joaquin County.  He was

1   intercepted over wiretaps communicating about his roles as IC member and RC.  At various points in

2   2016, 2017, and 2018, Franco was housed at San Quentin State Prison.  He informed NF members and

3   associates there that he was a member of the NF "Brass," and he issued various removal orders,

4   including that an inmate at San Quentin who was in "bad standing" with the NF should be attacked and

5   killed.

6       ***Trinidad Martinez***.  Trinidad Martinez (aka "Trino" aka "Jesse") is a CAT-III NF member and

7   member of the NF's Inner Council.  He was also the Regiment Commander of Tulare County, where he

8   was responsible for overseeing large sales of methamphetamine and heroin.  Martinez also was

9   previously the liaison for defendant Cervantes as GAO.  Martinez was intercepted over wiretaps

10  communicating about his various responsibilities in these roles, including discussing NF members'

11  operation within the street regiment that he oversaw, the movement of narcotics related to this regiment,

12  the collection and distribution of NF funds, and the structure of the NF organization.

13      ***Guillermo Solorio***. Guillermo Solorio (aka "Capone" aka "Caps") is an NF Inner Council

14  member, CAT-III NF member, and the Regiment Commander of Monterey County.  Solorio was not

15  intercepted during the wire portion of this investigation, but he was discussed over the wires as a high-

16  ranking NF member who was selected by the NF leadership to fill an Inner Council seat vacated by

17  Victim-14.  These wiretaps also show that Solorio was appointed as the Regiment Commander over the

18  Monterey County Street Regiment due to the "work" he put in making money for the NF in Fresno

19  through significant drug trafficking.

20  **III.   APPLICABLE STATUES**

21      The Indictment in this case alleges a racketeering conspiracy involving the Nuestra Familia

22  Enterprise in violation of 18 U.S.C. § 1962(d).  According to the Indictment, the pattern of racketeering

23  consisted of: (a) acts involving murder, (b) acts involving robbery, (c) drug trafficking, and (d) money

24  laundering.  ECF No. 1 at ¶ 16.

25      **A.   Statutory Language**

26      Title 18, United States Code, Section 1962(c) provides, in pertinent part:

27          It shall be unlawful for any person employed by or associated with any enterprise
            engaged in, or the activities of which affect, interstate or foreign commerce, to
28          conduct, or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity or collection of unlawful debt.

Title 18, United States Code, Section 1962(d) provides in pertinent part: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c)."

**B.      Applicable Law**

**1.      RICO Conspiracy**

To convict a defendant of RICO conspiracy, the government is not required to prove that the alleged enterprise was actually established, that the defendant was actually associated with the enterprise, or that the enterprise or its activities actually affected interstate commerce.  Instead, because the agreement to commit a RICO offense is the essence of a RICO conspiracy offense, the government need only prove that if the conspiracy offense were completed as contemplated, the enterprise would be established, the defendant would be associated with the enterprise, and the enterprise or its activities would affect interstate commerce.  *Salinas v. United States*, 522 U.S. 52, 65 (1997).

To convict a defendant of RICO conspiracy, the government also need not prove that individual enterprise members personally had agreed to commit two racketeering acts or had participated in the commission of the actual crimes.  *Salinas*, 552 U.S. at 63 (upholding the sufficiency of a RICO conspiracy conviction of a sheriff's deputy who facilitated scheme whereby his boss received multiple kickbacks from a prisoner in exchange for permitting unauthorized conjugal visits).  The government must only prove that the particular defendant agreed that, at some point during the life of the conspiracy, a member of the conspiracy would commit, on behalf of the conspiracy, at least two related acts of racketeering, with the jury being unanimous as to which type or types of predicate racketeering activity the defendant agreed would be committed.  *Id.* at 65.  As the *Salinas* Court stated:

> A conspirator must intend to further an endeavor which, if completed, would satisfy all the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crimes completion . . . A (RICO or other federal) conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective (here the operation of the RICO enterprise) and may divide up the work, yet each is responsible for the acts of each other. *See Pinkerton v. United States*, 328 U.S. 640 (1946). If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.

*Salinas*, 522 U.S. at 62–65.

To convict a defendant of a substantive RICO offense, the government must prove that the defendant personally participated in the operation or management of the enterprise. Such proof, however, is not required to convict a defendant of a RICO conspiracy offense. Rather, a defendant may be convicted of a RICO conspiracy offense provided that the defendant knowingly agreed to facilitate a scheme which, if completed, would constitute a RICO violation involving at least one conspirator who would participate in the operation or management of the enterprise. *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004) (holding that *Salinas* rendered the Ninth Circuit's prior decisions requiring that a defendant "conspired to operate or manage the enterprise herself" invalid, and instead holding that "a defendant is guilty of conspiracy to violate 1962(c) if the evidence showed that she knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise") (internal quotations omitted). Under *Salinas* and its progeny, the government may prove the defendant entered a conspiratorial agreement to violate RICO in two alternative ways: (1) the government may prove that the defendant agreed to commit two overt acts in furtherance of the enterprise or (2) it may prove that the defendant agreed to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two overt acts in furtherance of the enterprise. *See United States v. Nguyen*, 255 F.3d 1335, 1341 (11th Cir. 2001). Moreover, unlike a Section 371 conspiracy (18 U.S.C. § 371), the government need not establish that any overt acts were committed. *Salinas*, 522 U.S. at 63; *United States v. Corrado*, 286 F.3d 934, 937 (6th Cir. 2002); *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991); *United States v. Gonzalez*, 921 F.2d 1530, 1547–48 (11th Cir. 1991); *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987).

Regarding the agreement—it "need not be explicit; it may be inferred from the defendant's acts pursuant to a fraudulent scheme or from other circumstantial evidence." *United States v. Cloud*, 872 F.2d 846, 852 (9th Cir. 1989); *see also United States v. Boone*, 951 F.2d 1526, 1543 (9th Cir. 1991); *United States v. Hernandez*, 876 F.2d 774, 777 (9th Cir. 1989). The government need not prove direct contact between coconspirators or the existence of a formal agreement; instead, an agreement constituting a conspiracy may be inferred from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose. *United States v. Garza*, 980

F.2d 546, 552–53 (9th Cir. 1992); *United States v. Hegwood*, 977 F.2d 492 (9th Cir. 1992); *United States v. Becker*, 720 F.2d 1033, 1035 (9th Cir. 1983).

It is not necessary for the government to show that the defendant knew "the exact scope of the conspiracy, the identity and role of each of the co-conspirators, or the details of the operations of any particular plan." *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978).  However, the government must prove that the defendant was aware of "the essential nature of the plan."  *Blumenthal v. United States*, 332 U.S. 539, 557 (1947); *see also United States v. Krasovich*, 819 F.2d 253, 255–56 (9th Cir. 1987).  The key element of proof as to any specific co-conspirator is the showing that he knew, or had reason to know, of the participation of others in the illegal plan, and that he knew, or had reason to know, that the benefits to be derived from the operation were probably dependent upon the success of the entire venture.  *United States v. Abushi*, 682 F.2d 1289, 1293 (9th Cir. 1982); *United States v. Baxter*, 492 F.2d 150, 158 (9th Cir. 1973).

## 2. Enterprise

As defined by the RICO statute, the term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated-in-fact." 18 U.S.C. § 1961(4); *see Microsoft v. Odom*, 486 F.3d 541, 548 (9th Cir. 2007) (a single individual or legal entity can qualify as an enterprise).  To prove the existence of an associate-in-fact enterprise, such as the one charged in the Indictment, the government must establish the existence of an ongoing organization, whether it be formally or informally organized, acting with a common purpose and acting as a continuing unit.  *Odom*, 486 F.3d at 548, 552.[3]  To be acting as a continuing unit, it is not necessary

---

[3] Establishing that the members of the enterprise operated together in a coordinated manner in furtherance of a common purpose may be proven by a wide variety of direct and circumstantial evidence, including, but not limited to, inferences from the members' commission of similar racketeering acts in furtherance of a shared objective; financial ties; coordination of activities; community of interests and objectives; interlocking nature of the schemes; and overlapping nature of the wrongful conduct.  *See e.g.*, *United States v. Owens*, 167 F.3d 739, 751 (1st Cir. 1999) (members of drug trafficking enterprise provided other members with financial assistance and coordinated transportation of drugs); *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999) ("Additional evidence of [the enterprise's] organization and continuity comes from the robberies' consistent pattern"); *United States v. Davidson*, 122 F.3d 531, 535 (8th Cir. 1997) ("The length of these associations, the number and variety of crimes the group jointly committed, and Davidson's financial support of his underlings demonstrates an ongoing association with a common purpose to reap the economic rewards flowing from the crimes, rather than a series of ad hoc relationships").

that every member be involved in each of the acts of racketeering, that the predicate acts be interrelated in any way, that the membership in the organization remain constant over time, or that there be any ascertainable structure to the organization. *Id.* at 551–52. Instead, the focus is on whether the associates' behavior consists of ongoing, as opposed to isolated, activity. *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Odom*, 486 F.3d at 545–52. In *United States v. Boyle*, 556 U.S. 938 (2009), the Supreme Court held that an association-in-fact enterprise must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. The Court further held that the existence of an enterprise is a distinct element "beyond that inherent in the pattern of racketeering activity." *Id.* at 947. The Court emphasized, however, that although the pattern does not necessarily establish the enterprise, this does not mean that "the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Id.* The Court reiterated its holding in *Turkette* that "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Id.*

### 3. Employed By or Associated with the Enterprise

A person is "employed by" an enterprise when, for example, the person is on the payroll of the enterprise and performs services for the enterprise, holds a position in the enterprise, or has an ownership interest in the enterprise. *See, e.g.*, *United States v. Gabriele*, 63 F.3d 61, 68 (1st Cir. 1995).

A person is "associated with" the enterprise if the person joins with other members of the enterprise and knowingly aids or furthers the activities of the enterprise, or conducts business with or through the enterprise. *See. e.g.*, *United States v. Marino*, 277 F.3d 11, 27–29 (1st Cir. 2002); *United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005).

### 4. Conducted or Participated in the Affairs of the Enterprise

A particular defendant participates, directly or indirectly, in the conduct of the enterprise's affairs by participating in the operation or management of the enterprise by having some part in directing the enterprise's affairs. For a defendant to participate in the operation or management of the enterprise, the defendant need not exercise significant control over, or within, the enterprise. Similarly, the defendant need not have had either a formal position in the enterprise or have had primary

1  responsibility for the enterprise's affairs as "[a]n enterprise is 'operated' not just by upper management

2  but also by lower-rung participants in the enterprise who are under the direction of upper management"

3  or who carry out upper management's orders. *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993); *see*

4  *also Fernandez*, 388 F.3d at 1228. Therefore, "all who participate in the conduct of [the] enterprise,

5  whether they are generals or foot soldiers," can be held legally responsible under the RICO statute.

6  *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994).

7                          **5.       Pattern of Racketeering Activity**

8          The RICO statute defines a "pattern of racketeering activity" as at least two racketeering acts

9  within ten years of one another. 18 U.S.C. § 1961(5). To form a pattern, the two acts must be related to

10  each other and pose a threat of continuing activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492

11  U.S. 229, 238–40 (1989); *Fernandez*, 388 F.3d at 1221. In some cases, "the threat of continuity may be

12  established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of

13  doing business. Thus, the threat of continuity is sufficiently established where the predicates can be

14  attributed to a defendant operating as part of a long-term association that exists for criminal purposes."

15  *H.J. Inc.*, 492 U.S. at 241–43.

16                          **6.       Effect on Interstate Commerce**

17          The Ninth Circuit repeatedly has held that only a "de minimis" effect on interstate commerce is

18  required for a RICO violation. *Fernandez*, 388 F.3d at 1218; *see also United States v. Bagnariol*, 665

19  F.2d 877, 892 (9th Cir. 1981). Activities such as drug trafficking satisfy the de minimis interstate

20  commerce element. *See Gonzales v. Raich*, 545 U.S. 1, 2 (2005); *Taylor v. United States*, 579 U.S. 301,

21  307 (2016). Moreover, it is the activities of the enterprise, not each predicate act, which must affect

22  interstate commerce. *Bagnariol*, 665 F.2d at 892. The government is not required to prove that each

23  defendant knew that the Enterprise's activities would or did affect interstate commerce. "The

24  longstanding presumption is that the jurisdictional element of a criminal statute has no *mens rea*."

25  *United States v. Chang Ru Meng Backman*, 817 F.3d 662, 667 (9th Cir. 2016).

26          The Ninth Circuit's decision in *United States v. Virgen-Mendoza*, 91 F.4th 1033 (9th Cir. 2024),

27  does not rebut that presumption with respect to the racketeering statute. *Virgen-Mendoza* concerned a

28  violation under 18 U.S.C. § 1073—flight to avoid prosecution. *Id*. The jurisdictional element for this

offense derives entirely from the interstate or foreign movement of a subject.  Thus, for that particular statute, which requires moving someone across state or international borders, an unsuccessful conspiracy would necessarily require the defendant to have knowledge that he or she was to assist in moving the fugitive across a border for there to be a "sufficient threat" to federal interests.  *See id*. at 1039.  This logic does not extend to the racketeering statute, in which the federal interest in regulating drug trafficking, for example, is not predicated on the defendant having knowledge that drug trafficking affects interstate commerce.  Indeed, just as in *Backman*, nothing in the text or legislative history of the RICO statute "suggests that Congress meant to upend" the presumption that the jurisdictional element has no *mens rea*.  *Backman*, 817 F.3d at 667.

### 7.    Uncharged Crimes

It is well established that in RICO cases, evidence of uncharged crimes is admissible to prove the existence of the enterprise, a RICO conspiracy, a defendant's participation in both, continuity of the pattern of racketeering activity, and other related matters.  *See, e.g.*, *United States v. Matera*, 489 F.3d 115, 120–21 (2d Cir. 2007) (admission of uncharged murders committed by members of the Gambino LCN family to prove the RICO enterprise—the Gambino LCN family); *United States v. Keltner*, 147 F.3d 662, 667–68 (8th Cir. 1998) (uncharged criminal conduct by coconspirator admissible to prove the enterprise); *United States v. Salerno*, 108 F.3d 730, 738–39 (7th Cir. 1997) (uncharged extortionate collections by defendants admissible to prove the enterprise); *United States v. Disalvo*, 34 F.3d 1204, 1221 (3d Cir. 1994) (upholding admission of defendant's uncharged acts to establish the existence of the enterprise and the defendant's participation in and knowledge of the enterprise).

The government previously anticipated putting on evidence during its case in chief of five uncharged acts, but, as explained in Section IV below, it has now narrowed the scope of this evidence and plans to put forward evidence of three uncharged acts.

### 8.    Liability for Co-Conspirator Acts: *Pinkerton* Liability

It is a well settled tenet of conspiracy law, known as *Pinkerton* liability, that "a party to an unlawful conspiracy may be held responsible for substantive offenses committed by his coconspirators in furtherance of the unlawful project, even if the party himself did not participate directly in the commission of the substantive offense." *United States v. Vasquez*, 858 F.2d 1387, 1393 (9th Cir. 1988);

1   *see also Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946); *United States v. Olano*, 62 F.3d 1180,

2   1199 (9th Cir. 1995).  For *Pinkerton* liability to apply, it is necessary that the substantive offense was

3   within the scope of the unlawful agreement, was committed in furtherance of the conspiracy, and was

4   reasonably foreseeable as a natural consequence of the unlawful confederation.  *Pinkerton*, 328 U.S. at

5   647–48; *see also United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 1986) ("A co-conspirator is

6   responsible for any act done in furtherance of the conspiracy unless it could not reasonably be foreseen

7   as a natural consequence of the agreement"); *United States v. Reed*, 726 F.2d 570, 580 (9th Cir. 1984)

8   ("The law is clear that a defendant may be convicted of the substantive acts of his co-conspirators, as

9   long as those acts are committed pursuant to and in furtherance of the conspiracy.").

10          A conspirator who joins a pre-existing conspiracy is bound by all that has gone on before in the

11   conspiracy.  *See United States v. Umagat*, 998 F.2d 770, 772 (9th Cir. 1993) ("One may join a

12   conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy,

13   even if unknown to him"); *see also United States v. Bibero*, 749 F.2d 581, 588 (9th Cir. 1984); *United*

14   *States v. Saavedra*, 684 F.2d 1293, 1301 (9th Cir. 1982).

15   **IV.     OVERVIEW OF TRIAL SCOPE**

16          The Indictment specifically alleges 15 acts involving murder and at least three sets of drug

17   trafficking activities.  *Id.* at ¶¶ 19–35.  Numerous other specific and general criminal activities that

18   demonstrate this pattern of racketeering are identified in the discovery and were outlined in the

19   government's Statement of Anticipated Trial Scope (ECF No. 836).  In crafting its trial presentation, the

20   government has narrowed the scope of this evidence, and currently intends to present evidence of the

21   following 9 acts involving murder in its case-in-chief, which acts are identified below by approximate

22   date, victim, location, and associated trial defendant.  More specifically, since the government filed its

23   Statement of Anticipated Trial Scope, it has endeavored to trim its case to save judicial and party

24   resources, and has thus eliminated its intent to put on evidence relating to Special Sentencing Factor No.

25   3, evidence relating to the attempted murder of M.I., and evidence relating to the attempted murder of

26   A.O.  Those acts consequently have been removed from the below chart.

27

28

| | Approximate Date | Victim and Location | Trial Defendants Involved |
|---|---|---|---|
| 1 | April 2013 – November 2016 | Conspiracy to commit murder of Victim-1 at Pelican Bay State Prison as described in Special Sentencing Factor No. 2 | Cervantes, Perez, Franco |
| 2 | December 12, 2015 | Attempted murder of Victim-4 at Salinas Valley State Prison as described in Special Sentencing Factor No. 4 | Cervantes, Perez |
| 3 | April 20, 2016 | Attempted murder of Victim-5 at Salinas Valley State Prison as described in Special Sentencing Factor No. 5 | Cervantes, Perez |
| 4 | November 1, 2018 | Attempted murder of Victim-9 at Pleasant Valley State Prison as described in Special Sentencing Factor No. 9 | Perez |
| 5 | January 2019 – August 2021 | Conspiracy to commit murder of Victim-12 as described in Special Sentencing Factor No. 12 | Cervantes |
| 6 | July 18, 2019 | Attempted murder of Victim-14 at Pleasant Valley State Prison as described in Special Sentencing Factor No. 14 | Cervantes, Perez, Solorio, Martinez, Franco |
| 7 | February 2, 2017 | Attempted murder of Victim J.N. at High Desert State Prison | Solorio |
| 8 | June 12, 2017 | Attempted murder of E.V. at San Quentin State Prison | Franco |
| 9 | May 7, 2018 | Attempted murder of J.G. at CSP Sacramento | N/A[4] |

As the government previously has noted, it does not allege that any of the trial defendants personally carried out the above attacks, or that the trial defendants provided the means for the attack,

---

[4] The government does not intend to present evidence that any of the trial defendants were directly involved in this incident, but the government will present evidence that NF members were directly responsible.  Proof regarding this incident will not involve an undue consumption of trial time because the other NF members with direct responsibility are individuals whose names and actions will be part of the trial.

such as the weapon.  Instead, the government's evidence will show that the defendants counseled, commanded, procured, or induced the attackers to commit the acts of murder for which that defendant is identified in the table above.[5]

The government also intends to present evidence that the Enterprise engaged in a pattern of drug trafficking.  The discovery produced to the defense regarding the Enterprise's involvement in drug trafficking, both inside and outside California prisons, is extensive.  The government has pared down this evidence for its trial presentation.  As reflected in the Exhibit and Witness Lists, the government intends to present evidence of only one drug seizure:  On March 29, 2019, over one kilogram of cocaine and over 300 grams of heroin were seized from a residence on Ford Avenue in San Jose, which, the government's evidence will show, was being sold for the benefit of NF's Santa Clara County Regiment.  The remainder of the government's drug trafficking evidence will come in the form of intercepted communications, which have been identified on the government's Exhibit List and Rule 16 disclosures.

Similar to the drug trafficking evidence, the government's evidence of money laundering will be largely limited to cooperator testimony and intercepted communications.  For example, intercepted calls reference NF's taxation of drug sales and deposits in the "NF bank."  In addition, the government intercepted several messages, which are reflected on the government's Exhibit List, in which NF members report on the payment of "dues" from various county regiments.  For example, in a series of text messages on May 16, 2019, NF member Samuel Luna discusses "mov[ing] some financial records to [his] sd card," and then sends NF member Robert Maldonado the following message:

> Ok for the month of March the following was turned in for those areas under Halo..
> Madera/Jake/$1,500
> Sacra/Gallo/$2,000
> TC/Jesse/$6,500
> Krn Co./Jesse/$6,500
> Kings Co./The Viejo/$1,500
> Solano/Chevy/$1,000
> Subtotal= $19,000

May 16, 2019, Session 23700 at TT17 (TIII-0009543).  The government's evidence will show that "Gallo" is Steven Trujillo, "Jesse" is Trinidad Martinez, and "The Viejo" is David Cervantes, and that

---

[5] California law applies for aiding and abetting attempted murder and murder conspiracy, as more fully addressed in the parties' filing regarding jury instructions.

1   this message is referring to the proceeds of criminal activity.  Cooperator testimony will refer to other

2   instances of money laundering, including with respect to the Enterprise's use of "Green Dot" cards,

3   which are prepaid debit cards that work similarly to a debit card, but do not require a bank account, on to

4   which proceeds of criminal activity were transferred.  Unless a stipulation between the parties is

5   reached, the government may call a witness from Green Dot to testify about the company's effect on

6   interstate commerce.

7   **V.     EVIDENTIARY ISSUES**

8       **A.     Stipulations**

9       The government is seeking authenticity stipulations from the defense regarding:  (1) photographs

10  of the aftermath of the attacks listed in the chart above, including photos of the weapons and victims; (2)

11  videos of the attacks; (3) aerial photos of the facilities where attacks took place; (4) videos of the yard

12  where attacks took place; (5) medical records of the victims; (6) videos and photographs of the search of

13  the residence on Ford Avenue in San Jose; (7) mug shots of individuals involved in the charged

14  incidents and other predicate acts; (8) tattoo photographs of the defendants; (9) the contents of the

15  electronic devices seized from defendant Perez in November 2017; and (10) the wiretapped calls.  The

16  defense would maintain its ability to make all other arguments regarding admissibility of this evidence.

17  The government submits that the authenticity of these items—i.e., that they are what they purport to be

18  (*see* Fed. R. Evid. 901)—is not reasonably disputed.  The government has not heard from defense

19  counsel about the status of these stipulations.

20      **B.     Admissibility of Evidence**

21      To the extent that the parties are unable to reach stipulations regarding authenticity, the

22  government notes the following relevant legal standards.

23          **1.     Authentication and Identification/Chain of Custody**

24      Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or

25  identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a

26  finding that the matter in question is what its proponent claims."  As such, issues of authenticity and

27  identification are treated under Rule 901 as simply "a special aspect of relevancy."  Fed. R. Evid. 901(a)

28  (Advisory Committee Notes).

Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification." *United States v. Blackwood*, 878 F.2d 1200, 1202 (9th Cir. 1989) (internal quotations omitted) (citing *United States v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985)). Once the government meets this burden, "the credibility or probative force of the evidence offered is, ultimately, an issue for the jury." *Black*, 767 F.2d at 1342. The authenticity of proposed exhibits may be proven by circumstantial evidence. *United States v. Natale*, 526 F.2d 1160, 1173 (2d Cir. 1975); *United States v. King*, 472 F.2d 1, 9–11 (9th Cir. 1973). Moreover, the prosecution need only prove a rational basis from which the jury may conclude that the exhibits did, in fact, belong to the defendant. Federal Rule of Evidence 401(a); *United States v. Blackwell*, 694 F.2d 1325, 1330 (D.C. Cir. 1982).

To be admitted into evidence, a physical exhibit must be in substantially the same condition as when the crime was committed. The court may admit the evidence if there is "a reasonable probability the article has not been changed in important respects." *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991). This determination is to be made by the trial judge and will not be overturned except for clear abuse of discretion. Factors the court may consider in making this determination include the nature of the item, the circumstances surrounding its preservation, and the likelihood of intermeddlers having tampered with it. *See United States v. Kaiser*, 660 F.2d 724, 733 (9th Cir. 1981); *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960).

In establishing chain of custody as to an item of physical evidence, the government is not required to call all persons who may have come into contact with the piece of evidence. *Reyes v. United States*, 383 F.2d 734 (9th Cir. 1967); *Gallego*, 276 F.2d at 917. Moreover, a presumption of regularity exists in the handling of exhibits by public officials. *Kaiser*, 660 F.2d at 733; *United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir. 1984); *Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991). Therefore, to the extent that alleged or actual gaps in the chain of custody exist, such gaps go to the weight of the evidence rather than to its admissibility.[6] *Gallego*, 276 F.2d at 917.

---

[6] Thus far, the defense has raised authentication/chain of custody issues regarding (1) the "kites" the government has noticed its intention to call (see Def. Mot. In Limine No. 1); (2) the intercepted communications (see Def. Mot. In Limine No. 9); and (3) the contents of the electronic devices seized from defendant Perez (see Def. Mot. In Limine No. 14).

1
2.      **Photographs**

2       Photographs may be authenticated by a witness who "identif[ies] the scene itself [in the

3   photograph] and its coordinates in time and place."  *See Lucero v. Stewart*, 892 F.2d 52, 55 (9th Cir.

4   1989).  It is not necessary to have the photographer establish the foundation for the photograph.  Any

5   person sufficiently familiar with the contents of the photograph, such as the individuals and/or the area

6   depicted in the photograph, can be the proponent of its admission.  *Id.*; *see also United States v.

7   Henderson*, 241 F.3d 638, 650 (9th Cir. 2000) ("Lay witness may give an opinion regarding the identity

8   of an individual depicted in a photograph provided the witness has had sufficient contact with the

9   defendant to achieve a level of familiarity that renders the lay opinion helpful.") (internal quotations

10  omitted)).

11      Some of the individuals noticed on the government's Witness List are included purely for

12  authenticating the photographs that the government intends to introduce at trial.  The government will be

13  able to eliminate these witnesses if the defense agrees to the authenticity of the photographs that the

14  United States subpoenaed and obtained from CDCR pertaining to each of the acts set forth in the chart

15  above, as well as the photographs of the defendants' and co-conspirators' tattoos, and the photographs of

16  the CDCR facilities where the incidents took place.

17
3.      **Self-Authenticating Records & Charts and Summaries**

18      In order to accelerate the pace of trial and to avoid the need to call witnesses who would be

19  called to testify to matters that are beyond dispute, the government may seek to introduce a number of

20  business records, including medical records and CDCR housing histories, pursuant to Federal Rule of

21  Evidence 902(11).  The Federal Rules of Evidence provide that business records may be admitted into

22  evidence without a live witness if they are accompanied by a written declaration from a custodian of the

23  records certifying that the records were made in accordance with the requirements of Rule 803(6) of the

24  Federal Rules of Evidence.  *See Securities Exchange Commission v. Franklin*, 348 F. Supp. 2d 1159

25  (S.D. Cal. 2004); Rules 803(6) and 902(11), Federal Rules of Evidence.  The government has custodian

26  of records declarations for these categories of records.

27      Additionally (or perhaps alternatively), the government intends to make use of summary

28  witnesses and summary charts to reduce otherwise voluminous records—such as medical records and

housing histories—into a format that is succinct and understandable.  Federal Rule of Evidence 1006 provides that: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by the parties at a reasonable time and place. The court may order that they be produced in court."  The Advisory Committee Notes to Rule 1006 add that: "[t]he admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury. The rule recognized this practice, with appropriate safeguards."

A chart or summary may be admitted as evidence where the proponent establishes that the underlying documents are voluminous, admissible, and available for inspection.  *See United States v. Meyers*, 847 F.2d 1408, 1411-1412 (9th Cir. 1988); *United States v. Johnson*, 594 F.2d 1253, 1255–57 (9th Cir. 1979).  While the underlying documents must be "admissible," they need not be admitted." *See Meyers*, 847 F2d at 1412; *Johnson*, 594 F.2d at 239; *Barsky v. United States*, 339 F.2d 180 (9th Cir. 1964).

Summary charts may be used by the government in opening statement.  Indeed, "such charts are often employed in complex conspiracy cases to provide the jury with an outline of what the government will attempt to prove."  *United States v. De Peri*, 778 F.2d 963, 979 (3rd Cir. 1985) (approving government's use of chart); *United States v. Rubino*, 431 F.2d 284, 290 (6th Cir. 1970) (same). Summary charts need not contain the defendant's version of the evidence and may be given to the jury while a government witness testifies concerning them.  *See United States v. Radseck*, 718 F.2d 233, 239 (7th Cir. 1983); *Barsky*, 339 F.2d at 181.  In addition, summary charts are admissible under Federal Rule of Evidence 611(a), which permits a court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."  *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980).

Typically, charts used under Rule 611(a) for "pedagogical purposes," or as "testimonial aids," should "not be admitted into evidence or otherwise be used by the jury during deliberations."  *United*

1   *States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991) ("We have long held that such pedagogical devices

2   should be used only as a testimonial aid, and should not be admitted into evidence or otherwise be used

3   by the jury during deliberations."); *see also United States v. Abbas*, 504 F.2d 123 (9th Cir. 1974) (better

4   practice is that charts used as testimonial aids not be submitted to jury).

5   Charts, however, may be used under Rule 611(a) and then subsequently admitted into evidence

6   in those instances in which the defense has had opportunity to challenge the information contained in the

7   chart. For example, in *Gardner*, the district court admitted, over defense objection, a chart used by a

8   government witness as a testimonial aid that summarized facts and calculations already in evidence.

9   *Gardner*, 611 F.2d at 776. The Ninth Circuit held that the use of this chart as a testimonial aid was

10   appropriate under Rule 611(a), and that the chart was properly admitted into evidence under Rule 1006:

11   "Having thus utilized the chart without objection with a full opportunity for the defendant to challenge

12   the facts, figures, calculations and underlying documents upon which the chart was based, it was not

13   reversible error to admit the chart in evidence." *Id.* at 776; *see also Olano*, 62 F.3d at 1204.

14   A summary witness may properly testify about, and use a chart to summarize, evidence that has

15   already been admitted. As the Ninth Circuit has recognized, the court and jury are entitled to have a

16   witness "organize and evaluate evidence which is factually complex and fragmentally revealed." *United*

17   *States v. Shirley*, 884 F.2d 1130, 1133–34 (9th Cir. 1989) (agent's testimony regarding her review of

18   various telephone records, rental receipts, and other previously offered testimony held to be proper

19   summary evidence, as it helped jury organize and evaluate evidence; summary charts properly

20   admitted). A summary witness also may rely on the analysis of others as the use of others in the

21   preparation of summary evidence goes to the weight and not the admissibility of the evidence. *United*

22   *States v. Soulard*, 730 F.2d 1292, 1299 (9th Cir. 1984); *see Diamond Shamrock Corp. v. Lumbermens*

23   *Mutual Casualty Co.*, 466 F.2d 722, 727 (7th Cir. 1972) ("It is not necessary . . . that every person who

24   assisted in the preparation of the original records or the summaries be brought to the witness stand.").

25   ### C.   Miscellaneous Matters

26   #### 1.   Cooperator Jail Calls

27   On April 1, 2024, the government produced prior statements made by cooperating witnesses

28   during recorded jail calls, as outlined by its certification in ECF No. 1188. Because these calls included

large portions of the non-cooperator caller speaking, as well statements that do not relate to the subject matter of the witness's testimony, the government produced 41 clips to the defense.  In an email that was sent to the Court and to the government on April 11, 2024, the defense requested the entirety of those 41 calls and stated that, in the alternative, it would ask the Court to conduct an in camera review of the calls.  The defense also requested the names and/or phone numbers of the people talking to the cooperating witnesses.  To expedite the matter and avoid undue consumption of the Court's time, the government offered on April 19, 2024 to produce the entirety of the calls previously produced if the defense agreed to designate those materials as Attorneys-Eyes-Only at this point in recognition of the significant safety and privacy concerns for the non-cooperator callers.  Given those same safety and privacy concerns, the government asked the defense to provide legal authority or explain why it needed the names and/or phone numbers of the non-cooperator callers in order to evaluate the cooperators' statements for possible use at trial.  The government has not received a response to date.

### 2.    Reciprocal Discovery

The government has requested reciprocal discovery.  No reciprocal discovery has been provided, including any expert opinions that the defense intends to offer, such as from their potential gang expert Paul Medina.  To the extent that there exists reciprocal discovery to which the government is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure and which the defense has not produced prior to trial, the government reserves the right to seek to have such documents or other evidence precluded should a defendant attempt to introduce or use them at trial.  *See United States v. Young*, 248 F.3d 260, 269–70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

### 3.    Scope of Lay Witness Testimony

The United States currently intends to introduce dozens of intercepted calls and messages through two agents:  FBI Special Agent Glenn Hotema and FBI Special Agent Laura Mruk.  The United States may ask these agents to interpret ambiguous phrases in the calls and messages, opine about individuals' roles in the organization, and identify individuals by gang moniker.

1    The Ninth Circuit has held that each of these topics is permissible lay witness testimony.  First,

2    "an officer may give lay testimony about the meaning of ambiguous phrases in recorded calls" if the

3    interpretations are "based on the officer's observations in the case, [do] not rely on hearsay, and [are]

4    helpful."  *United States v. Torralba-Mendia*, 784 F.3d 652, 660 (9th Cir. 2015); *see also United States v.*

5    *Freeman*, 498 F.3d 893, 905 (9th Cir. 2007) (holding that an officer properly interpreted "'[m]an, it's

6    done already' to mean 'he's given the cocaine to Kevin Freeman and that he's received money for it'"

7    because this interpretation was based on the witness's personal knowledge of the investigation); *United*

8    *States v. Simas*, 937 F.2d 459, 465 (9th Cir. 1991) ("Simas' statements to the FBI agents were vague

9    and, at times, seemingly incomprehensible. The listener's understanding of the words and innuendo was

10   helpful to the jury in determining what Simas meant to convey.").  The officer's interpretation of such

11   ambiguous conversations must be based on "'his direct knowledge of the investigation,' including his

12   'direct perception of several hours of intercepted conversations . . .  and other facts he learned during the

13   investigation.'"  *United States v. Vera*, 770 F.3d 1232, 1242–43 (9th Cir. 2014) (quoting *Freeman*, 498

14   F.3d at 904–05).

15       Second, "[a] lay witness may opine about a person's role in an organization when the opinion is

16   based on his own perceptions, is helpful to the jury, and does not require specialized knowledge."

17   *Torralba-Mendia*, 784 F.3d at 661.

18       Third, a lay witness who testifies based on his personal observations may "match[] gang

19   members to monikers and vice versa, translate[] gang jargon, and identif[y] indicia of drug trafficking."

20   *United States v. Perez*, 962 F.3d 420, 434–38 (9th Cir. 2020) ("None of this testimony was

21   impermissible under Rule 701. [The case agent] directly observed the communications, meetings, and

22   searches he described.").

23       Both of the FBI Special Agents the government intends to call participated in the wiretap

24   investigations from their inception.  Their testimony will be based on these personal observations and

25   experiences.

26       **4.    Witness Exclusion**

27       The government requests that Special Agent Andrew Jimenez be excluded from the Court's

28   sequestration order.  *See United States v. Baras*, No. CR 11-00523 YGR, 2013 WL 6502846, at *4

1   (N.D. Cal. Dec. 11, 2013) (citing *United States v. Thomas*, 835 F.2d 219, 223 (9th Cir. 1987)

2   (investigating FBI agent properly excluded from Rule 615 although he was a witness) and *United States*

3   *v. Little*, 753 F.2d 1420, 1441 (9th Cir. 1984) (IRS agent allowed to remain at prosecutor's table

4   throughout trial despite assertion agent abused position by relaying information and coaching

5   prospective government witnesses)).

6   DATED:  April 24, 2024                                    Respectfully submitted,

7                                                             MARTHA BOERSCH
                                                              Chief, Criminal Division
8

9                                                             _____/s/_____
                                                              MARJA-LIISA OVERBECK
10                                                            LEIF DAUTCH
                                                              ASEEM PADUKONE
11                                                            Assistant United States Attorneys